**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Global Traffic Technologies,
LLC,

                        Plaintiff,

        v.

Emtrac Systems, Inc.,
Kristopher Morgan, Andrew
Morgan, Rodney K. Morgan,
and KM Enterprises, Inc.,

                        Defendants,

_____

KM Enterprises, Inc.,

                        Plaintiff,

        v.

Global Traffic Technologies,
LLC,

                        Defendant,

_____

Global Traffic Technologies,
LLC,

                        Plaintiff,

        v.

STC, Inc.,

                        Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 10-4110 ADM/JJG

_____

Chad Drown, Esq., James Poradek, Esq., Timothy E. Grimsrud, Esq., Kate Razavi, Esq., Luke Tomsich, Esq., Timothy Sullivan, Esq., Ari B. Lukoff, Esq., and David J.F. Gross, Esq., Faegre Baker Daniels LLP, Minneapolis, MN, on behalf of Global Traffic Technologies, LLC.

Jonathan D. Jay, Esq., Terrance C. Newby, Esq., and Nicholas S. Kuhlmann, Esq., Leffert Jay & Polglaze, P.A.,  Minneapolis, MN, on behalf of KM Enterprises, Inc., STC, Inc., Emtrac Systems, Inc., Kristopher Morgan, Andrew Morgan, and Rodney Morgan.

---

## I.  INTRODUCTION

On February 15, 2013, the undersigned United States District Judge heard oral argument on the parties' cross-motions for summary judgment and on the parties' motions to exclude expert testimony.  For the reasons set forth below, Defendants' summary judgment motion is denied.  Plaintiff's summary judgment motion is denied in part and granted in part.  Plaintiff's motion to exclude is granted and Defendants' motion to exclude is denied.

## II.  BACKGROUND

### A.  Technology at Issue

By law and tradition, emergency vehicles are given priority on the road to respond as quickly as possible to calls for help.  Emergency vehicles are equipped with flashing lights and sirens to alert drivers to their presence.  When drivers see flashing lights or hear sirens from emergency vehicles, they must pull over, stop, and keep clear of intersections so the emergency vehicle can quickly and safely respond to a call.

Unfortunately, people on the road do not always hear the sirens or see the flashing lights and, especially at intersections, accidents do occur.  Increasingly, municipal governments equip emergency vehicles with technology to enable improved response times and an increase in safety to both emergency personnel and the public.  Also, more recently, municipal governments have decided to give certain public transportation vehicles priority for increased efficiency and to allow light rail transit to cross roadways safely.

Emergency vehicles and public transportation vehicles can now be equipped with a traffic preemption system ("TPS").  <u>See</u> Am. Compl. [Docket No. 30] Ex. B, United States Patent No. 5,539,398 (the "'398 Patent"), at 1:22-23.  Emergency vehicles often need to cross intersections against a red light and with speed.  <u>Id.</u> at 1:27-32.  A TPS functions to either prolong a green light or switch a light from red to green to allow the equipped vehicle to proceed through the intersection safely.  <u>Id.</u> at 1:41-45.

From their inception in the 1960s, TPS's have evolved significantly.  TPS originally relied on, and some systems still rely on, an optical preemption system, whereby an emitter on top of a vehicle produces strobes of light directed at detectors mounted on or near traffic lights.  <u>Id.</u> at 1:36-39 (citing U.S. Patent No. 3,500,078).  These detectors then relay a signal to the intersection cabinet, which processes the signal and directs the traffic light to change from red to green.  <u>Id.</u>  Optical systems have several disadvantages, including that the vehicle needs a direct line of sight to the intersection for the strobe light to hit the detector; weather can also interfere with the transmission of the strobe light.  <u>Id.</u> at 2:55-58, 3:42-43.

TPS developed to rely on a radio preemption system, which sends radio signals, rather than light beams, from the vehicle to the intersection.  <u>Id.</u> at 2:65-67.  Radio preemption systems do not require a direct line of sight, and are not as focused or directionally-oriented as the optical systems.  <u>Id.</u> at 3:31-33.  However, radio-based systems sometimes result in the unintended triggering of traffic signal systems at adjacent intersections.  <u>Id.</u> at 3:5-11.

The third generation TPS uses integrated Global Positioning System ("GPS") technology to enable priority vehicles to pass unimpeded through selected intersections.  <u>Id.</u> at 3:48-53.

**B. Claims**

Plaintiff Global Traffic Technologies ("GTT") is the owner by assignment of all right, title, and interest in the '398 Patent, which relates to TPS using GPS technology. See Am. Compl. ¶ 17. Defendants and Counterclaimants KM Enterprises, Inc. ("KME"), STC, Inc. ("STC"), Emtrac Systems, Inc. ("Emtrac"), Kristopher Morgan, Andrew Morgan, and Rodney Morgan (collectively, "Defendants") are all involved in some manner with the manufacture and sale of the Emtrac Priority Control System (also referred to as the "Accused Product").

GTT asserts Defendants have infringed its '398 Patent by making, using, selling, and installing traffic control management systems, namely the Emtrac Priority Control System, in violation of 35 U.S.C. § 271. Id. GTT also seeks to hold Rodney K. Morgan personally liable for the alleged infringement.[1] Id. at ¶¶ 29-39. GTT alleges Morgan continued to sell the Emtrac Priority Control System under the Emtrac corporate name after the company had been dissolved as a corporate entity. Id. at ¶ 37. Thus, GTT claims Morgan is liable as a director of Emtrac under Illinois' Business Corporations Act, 805 Ill. Comp. Stat. 5/8.65(3). Id.

Defendants deny the Emtrac Priority Control System infringes GTT's '398 Patent, and Defendants seek a declaratory judgment of non-infringement and of invalidity. In addition, Defendants have filed a counterclaim against GTT for allegedly using unfair and illegal practices to prevent Defendants' Emtrac Priority Control System from competing in the market. See

---

[1] GTT is not pursuing individual liability claims against Kristopher Morgan and Andrew Morgan. GTT's Br. Opp'n to Defs.' Mot. Summ. J. [Docket No. 169] 42. Therefore, the Court dismisses them from this litigation.

4

KME's Compl. ¶ 1.[2]  Specifically, Defendants claim GTT has violated the Lanham Act, 15

U.S.C. § 1125 et seq., by using images of Defendants' Emtrac Priority Control System to market

GTT's Opticom GPS System.  Id.  Finally, Defendants also assert Minnesota state law claims for

false advertising under Minn. Stat. § 325F.67 et seq., deceptive trade practices under Minn. Stat.

§ 325D.44 et seq., and a common law claim for tortious interference with prospective contractual

relations.  Id.

## C.  Procedural Posture

Defendants' Motion for Summary Judgment [Docket No. 123] ("Defs.' Mot. Summ. J.")

seeks rulings that: (1) GTT cannot prove an invention date prior to the '398 Patent's filing date;

(2) certain publications are prior art to GTT's patent; (3) GTT's patent is invalidated by a prior

invention; (4) laches prevents GTT from bringing its case; (5) Defendants have not infringed

directly, indirectly, or willfully; (6) the individual Defendants cannot be held personally liable;

and (7) GTT falied to comply with the patent marking statute.

GTT filed its own Motion for Summary Judgment [Docket No. 126] ("GTT's Mot.

Summ. J.") also seeking summary judgment on multiple issues.  First, GTT seeks summary

judgment that KME's two counterclaims, (1) KME's false advertising claim and (2) KME's

tortious interference claim, fail as a matter of law.  Second, GTT seeks summary judgment on

---

[2] In January 2012, the Court agreed to a stipulated consolidation of related cases.  Order re: Stipulation, January 20, 2012 [Docket No. 77].  The Court consolidated  KM Enter., Inc. v. Global Traffic Technologies, LLC, Civ. No. 10-4478 (ADM/JJG), and Global Traffic Techs., LLC v. STC, Inc., Civil No. 11-3682 (ADM/JJG), under Global Traffic Techs., LLC v. Emtrac Sys., Inc., et al., Civil No. 10-4110 (ADM/JJG).  All docket number references are to Civil No. 10-4110, except GTT's complaint against STC was not added to the amended complaint in the consolidated action.  GTT's complaint against STC may still be found filed as Docket No. 1 ("GTT's STC Compl.") under Civil No. 11-3682.  And, KME's complaint against GTT is still filed as Docket No. 1 ("KME's Compl.") under Civil No. 10-4478.

patent issues, namely that: (1) Defendants' alleged prior art references are not actually prior art; and (2) Defendants' anticipation defenses fail.

GTT also filed a Motion to Exclude Expert Testimony [Docket No. 132] by Defendants' expert Dean Thompson ("GTT's Daubert Motion").  Similarly, Defendants filed a Motion to Exclude Testimony [Docket No. 160] by GTT's expert Donald Gorowsky ("Defs.' Daubert Motion").

**D.  GTT's Version of Invention and the '398 Patent**

In early December 1992, Tim Hall and Steven Hamer discussed an idea for GPS-based traffic preemption system while on a flight returning from a business trip.  Hall Decl. [Docket No. 137] ¶ 3; Hamer Decl. [Docket No. 139] ¶ 3.  At the time, Hall and Hamer worked for Minnesota Mining and Manufacturing Company ("3M").  When they returned to work, Hall and Hamer discussed the idea with Mark Schwartz, also an employee of 3M.  Schwartz suggested adding features to take advantage of differential GPS and improve the system's accuracy. Schwartz Decl. [Docket No. 138] ¶ 3; Hall Decl. ¶ 5; Hamer Decl. ¶ 5.  On December 17, 1992, Hall recorded the inventors' idea in his 3M laboratory notebook.  Hall Decl. ¶ 6; Drown Decl. Supp. GTT's Mot. Summ. J. [Docket No. 129] ("Drown Decl.") Ex. 3.  By December 13, 1993, 3M had built a prototype that confirmed the invention worked as intended—namely, the prototype used GPS data to determine if a vehicle was within an allowed approach of an intersection and, if so, issued a preemption request.  Schwartz Decl. ¶ 6-7; Drown Decl. Ex. 4. The inventors filed patent application number 178,881 on January 7, 1994, on behalf of 3M.  The inventors filed a continuation of this application on August 16, 1995, which matured into the '398 Patent, issued on July 23, 1996.  '398 Patent at 1:4-5.  In 2007, 3M divested its Traffic

Safety Division.  3M sold the rights to the '398 Patent and the Opticom Priority Control Systems to TorQuest Partners, Inc., which formed GTT to manage the former 3M Traffic Safety Division. Drown Decl. Ex. 10.

**E.  Defendants' Version of Prior Invention**

Defendants argue that a combination of Defendants and other companies invented the first GPS-based system for a TPS, making the '398 Patent invalid under 35 U.S.C. § 102 (g).

According to Defendants, around 1986, Rodney Morgan and Brad Cross worked together inventing the first Emtrac TPS product (the "Early Emtrac System"), a radio-based TPS, which they sold through a company called Traffic Control Devices ("TCD").  Jay Decl. Supp. Defs.' Mot. Summ. J. ("Jay Decl.") [Docket No. 130] Ex. 1 ("Morgan Dep."), at 38:20-39:12.  In 1990, Morgan licensed to Econolite Company ("Econolite") the right to sell the Early Emtrac System, patented under U.S. Patent No. 4,914,434 (the "'434 Patent").  Id. Ex. 62 ("Distribution and Licensing Agreement").

STC manufactured the Early Emtrac System for distributors TCD and Econolite.  STC worked with distributors giving technical support and design enhancement services.  Id. Ex. 5, at 7:21-14:2.  Cross, one of the system's inventors, served as STC's Vice President from 1987 to 1990, and thereafter as its President.  Id.  On May 25, 1993, Cross sent Econolite employees Harrald Weiss and Gary Duncan a memorandum that described a proposed TPS system based on the idea that GPS technology could be used to improve the Early Emtac System.  Id. Ex. 12 ("Cross Invention Memo"); Ex. 11 ("Ducan Dep."), at 40:12-41:15, 84:10-87:1; Ex. 13 ("Econolite Correspondence").  Throughout 1993 and 1994, Weiss, Duncan and Cross continued to exchange written correspondence regarding the feasibility of re-designing the Early Emtrac

System to include GPS capability.  Id. Ex. 13; Exs. 50-60.  Around January 1995, Econolite

decided it would no longer pursue an Emtrac system with GPS; instead, Traffic Control

Corporation ("TCC"), and its President Gary Jones, expressed an interest in developing the GPS-

based system.  Id. Ex. 13, at 272.  Econolite agreed to allow TCC to continue development of a

GPS based preemption system.  Id.  TCC developed its GPS TPS system through its subsidiary,

Midwest Traffic Products, Inc. ("Midwest").[3]  Id. Ex. 11, at 24:19-26:1.  Weiss learned Jones

"had continued the development that had been discussed at Econolite," which Weiss connected

to the design work of Cross and STC.  Id. Ex. 14 ("Weiss Dep."), at 89:13-90:20, 94:24-95:12;

Ex. 11, at 33:10-20.  Midwest commercialized its GPS TPS system, calling it Priority One, and

obtained patent protection for it under U.S. Patent No. 5,926,113 (the "'113 Patent"), which

issued in 1999, based upon an application filed May 5, 1995.  In 1997, 3M sued Midwest

alleging that the Priority One product infringed claims of the '398 Patent.  See Compl. [Docket

No. 1], Minn. Mining and Mfg. Co. v. Midwest Traffic Prods, Inc., Civ. No. 97-605

(DWF/AJB).  3M and Midwest settled the patent case and as part of their agreement, 3M

received an assignment of patents owned by Midwest, including the '113 Patent.  Id. at Consent

Judgment [Docket No. 42], February 10, 1999.

**F.  Defendants' Version of Prior Art**

Defendants argue, under 35 U.S.C. § 102(a), the '398 Patent is invalid because the

invention was "described in a printed publication" before GTT's inventors conceived of the

invention ultimately protected by the '398 Patent.  Defendants offer two papers and the Cross

---

[3] The licensing arrangements and business relationships between Emtrac, KME,
Econolite, TCC, Midwest and STC are not explained in the record of this case.

Invention Memo, mentioned in Section II.E. above, as evidence of printed publications which preempt and invalidate the '398 Patent.

The two papers cited  by Defendants as prior art were prepared by Horst Gerland, with co-authorship on one by William T. Bradfield.  Gerland, a civil engineer, worked in Germany's transportation industry.  According to Defendants, Gerland invented a GPS-based TPS system before GTT's patented invention.  Jay Decl. Ex. 17 ("Gerland Dep."), at 13:24-18:20.  In 1991, Gerland accepted a consulting position with Gesellschaft fuer Systemtechnik und Informatik ("GSI") in Salem, Germany.  Id.  In February 1993, Gerland, for GSI, and Bradfield, a general manager of public sector systems for Bell Atlantic Systems Group, Inc. ("Bell Atlantic"), co-authored a document titled "Intelligent Transportation System" (the parties refer to this as the "Bradfield Paper").  Id. Ex. 18.  Gerland testified the marketing paper was sent to multiple United States transit agencies to solicit business.  Id. Ex. 17, at 46:6-47:8.  Defendants' expert, Scott Andrews, claims the Bradfield Paper discloses the limitations of all asserted claims of the '398 Patent.  Id. Ex. 19 ("Andrews' Expert Report"), at 85-114.

In October 1993, Gerland attended a vehicle navigation systems conference in Ottawa, Canada.  Id. Ex. 17, at 90:16-22.  Gerland spoke at the conference about GSI's GPS TPS system (the "Saarbruken System"), and also presented a technical paper about it entitled, "ITS, Intelligent Transportation Systems" (the "Gerland Paper").  Id. at 93:19-94:20; Ex. 20. Defendants claim the paper was distributed, publicly available, and discloses all asserted claims of the '398 Patent.  Defs.' Mem Supp. Mot. Summ. J. at 9, ¶ 20.

**G.  Defendants' Version of Competition**

At the same time that the parties were competing to develop a GPS-based TPS, they were also still selling older, optical- and radio frequency-based TPS devices.  Morgan developed a radio frequency-based preemption and priority system (the "RF Emtrac System"), and in 1988 he marketed it under his '434 Patent.  KME Compl. ¶¶ 10, 14-15.  The RF Emtrac System competed against what was then 3M's Opticom System, an optical traffic preemption system.  Id. at ¶¶ 12, 15.  By 1990, the original RF Emtrac System had surpassed the Opticom System in sales.  Id. at ¶ 15.  In 1991, Econolite, which had been distributing 3M's Opticom System, approached Morgan seeking to become the exclusive distributor for the RF Emtrac System.  Id. at ¶ 16.  Econolite eventually ceased distribution of the Opticom System and began exclusively selling, marketing, producing, and maintaining the RF Emtrac System.  Id.  Econolite and Morgan also agreed that Econolite would license and maintain the '434 Patent and any intellectual property related to the Emtrac System.  Id.

According to Defendants, in 1993, while working with Econolite on the RF Emtrac System, Morgan's co-inventor, Cross, designed a further improved system for including GPS capabilities in the RF Emtrac System.  Id. at 17.  The GPS capabilities were not added to the RF

Emtrac System in 1993 because, at that time, the GPS system performance was inadequate.[4] Id. at ¶ 18.

3M, predecessor to GTT, first sold an Opticom System with GPS (referred to as the "Opticom GPS System") in 2001 or 2002.  Defs.' Mem. Supp. Mot. Summ. J. 10 (citing Jay Decl. Exs. 8 and 21).  Morgan testified that in 2004 GPS functionality was added to commercially available Emtrac Systems.  Id. at 11 (citing Ex. 1, at 57:16-58:10).  Defendants' cited exhibits do not explain how this added GPS functionality worked, who sold these first Emtrac systems with GPS, or whether any sales were actually made.

But, in April 2005, Morgan formed Emtrac Systems, Inc. to sell Emtrac Priority Control Systems manufactured by STC.  Ans. [Docket No. 11] ¶ 18; GTT's STC Compl. ¶ 1.  Emtrac Systems, Inc. was involuntarily dissolved on September 11, 2009.  Am. Compl. ¶ 3.  On July 18, 2007, KME, which is currently in business, was formed as a seller and distributor of Emtrac Systems.  KME Compl. ¶ 10.  Since about 2004, 3M, which became GTT, began selling Opticom GPS Systems and competed in the market with Emtrac's GPS Systems.

---

[4] Defendants' expert reports:

> Up until May 2, 2000, GPS signals available for civilian use had been intentionally corrupted to limit the accuracy of any non-authorized use of the signals.  This intentional corruption was known as "Selective Availability" (SA).  In 1996, when United States President Bill Clinton signed an executive order to deactivate SA, Civilian GPS receivers were capable of resolving position to an accuracy of about 47 meters (147 feet) with about 95% confidence.  Following the deactivation of SA, this accuracy, as measured by the same receiver with no other modifications was about 6.5 meters (21) feet.

Jay Decl. Ex. 19 (Corrected Expert Report of Scott Andrews) 35, at ¶ 132.

**H.  Defendants' Version of Delayed, Untimely Suit**

Defendants claim that an Emtrac system with GPS was first sold in about 2004.  Jay

Decl. Ex. 1, at 57:16-58:10.  The chronology supporting their argument that 3M and then GTT

were on notice of possible infringement by Defendants is the following.  Schwartz, then still

working for 3M, learned that an Emtrac system was using GPS technology no later than March

2005.  Id. Ex. 22 ("Schwartz Dep."), at 77:14-78:14.  In February 2006, Schwartz and others

were advised by 3M Canada that the City of Coquitlam, Canada, intended to purchase and install

an Emtrac system that used GPS technology.  Id. at 99:11-100:6.  GTT was formed in 2007 by

employees from 3M's Traffic Safety Division, including: Tim Hall, Steve Hamer and Mark

Schwartz, the co-inventors named on the '398 Patent; Pat Cosgrove, a technical services

engineer; and business manager Richard Sachse, who became GTT's President.  In 2007,

Schwartz received additional technical information regarding the Emtrac systems.  Id. at 77:14-

84:9; Exs. 69-71.  The Opticom GPS System's co-inventor Hall prepared quarterly reports

regarding Emtrac to be presented at GTT's board of director meetings.  Id. Ex. 8, at 70:5-73:14;

Ex. 26, at GTT00208076.  Beginning no later than April 2008, GTT held a "Business Team"

meeting where Emtrac and several other competitors were discussed.  Id. Ex. 27, at GTT 9549-

9550.  Finally, in August 2009, GTT's management "was assigned [the task of] defin[ing] what

features GTT, LLC would need to add to its existing products to compete more effectively with

Emtrac."  Id. Ex. 65 (GTT Board Meeting Minutes).

GTT filed suit against Emtrac on September 30, 2010.  GTT brought STC, the

manufacturer, into the suit on December 22, 2011.  Defendants argue GTT was on notice of

possible patent infringement as early as March 2005, and yet GTT delayed until 2010 to file suit.

Defendants argue that the delay eroded evidence and dimmed witness memories; therefore, Defendants conclude the delay has been too long and laches should bar prosecution of this case.

## I.  GTT's Version of Timely Suit

According to GTT, Defendants did not start infringing on GTT's patent until 2007 when Defendants sold the infringing Emtrac Priority Control System which used GPS.  GTT's Br. Opp'n to Defs.' Mot. Summ. J. 15.  Previous versions of the Emtrac system did not violate the patent.  Id. at 15-16.  Defendants' 1980's version "used an electronic compass, not a GPS device."  Id.  Between 2004 and 2006, GTT alleges, Defendants sold an Emtrac system that swapped out the electronic compass for a GPS compass.  Id. (citing Decl. Timothy E. Grimsrud Supp. GTT's Opp'n to Defs' Mot. Summ. J. [Docket No. 172] Ex. 16 ("Supplemental Answers of Defs. to First Set of Interrogatories"), at 13, and Ex. 2 ("Morgan Dep."), at 63).  GTT argues that this device did not infringe its patent, either.  The product that GTT accuses of infringement is the "Emtrac GPS System" which was introduced in 2007.  Jay Decl. Ex. 15, at 28-29 (citing STC sales information).  GTT claims it reasonably investigated the Accused Product and corresponded with Defendants about alternative solutions, such that after three years of due diligence, GTT filed suit in 2010.

## J.  Defendants' Version of Tortious Interference and False Advertising

Defendants claim customers and distributors preferred the cost, design, and functionality of the Emtrac GPS System over GTT's Opticom GPS System.  KME Compl. ¶ 23.  Defendants claim GTT threatened Defendants and customers who bought the Emtrac systems, by telling them that Defendants were in violation of GTT's patent and that GTT would sue them for false advertising if they published positive reviews of the Emtrac system.  Id. at ¶ 27.

Defendants also aver GTT issued a misleading press release announcing GTT's suit against Defendants, on October 1, 2010.  Id. at ¶ 39.  Defendants assert GTT contacted KME's prospective customers and/or distributors in an effort to convince them to stop doing business with Defendants because of the alleged patent infringement.  Id. at ¶¶ 46-48.  Finally, Defendants claim GTT falsely advertises its products and experience on GTT's website.  Id. at ¶ 49.  GTT's website advertises its Opticom GPS System using a video in which the depicted vehicles are not actually using the Opticom GPS System but are instead using KME's Emtrac Priority Control System.  Id.

## III.  DISCUSSION

### A.  Summary Judgment Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall issue "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).  The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).  If evidence sufficient to permit a reasonable jury to return a verdict in favor of the nonmoving party has been presented, summary judgment is inappropriate.  Id.

**B.  Patent Basics**

Federal patent laws represent "a careful balance between the need to promote innovation and the recognition that imitation and refinement through imitation are both necessary to invention itself and the very lifeblood of a competitive economy." Bonito Boats v. Thunder Craft Boats, 489 U.S. 141, 146 (1989).  Patents offer protection to "whoever invents or discovers any new and useful process, . . . or any new and useful improvement thereof."  35 U.S.C. § 101.

Once a patent is issued, the owner of the patent is entitled to its protection unless it is discovered that:

> (a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or
> . . .
> (g) . . . (2) before such person's invention thereof, the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it. In determining priority of invention under this subsection, there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

35 U.S.C. § 102 (only sections relevant to this order included).

Patent claims are presumed valid. Id. § 282.  Further, each claim is "presumed valid independently of . . . other claims" and "dependent . . . claims shall be presumed valid even though dependent upon an invalid claim." Id.; see Apple Computer, Inc. v. Articulate Sys., Inc., 234 F.3d 14, 24 (Fed. Cir. 2000).  This presumption can be overcome, however, by clear and convincing evidence of invalidity.  See Nat'l Presto Indus., Inc. v. W. Bend Co., 76 F.3d 1185, 1189 (Fed. Cir. 1996).  A patent fails § 102's novelty requirement and is considered "anticipated" if all of its claimed limitations are disclosed by a single prior art reference. Schering Corp. v. Geneva Pharms., Inc., 339 F.3d 1373, 1377 (Fed. Cir. 2003).

### 1.    Genuine Issues of Material Fact Exist Regarding the Invention Date

The patent holder has the presumption of validity.  Ultimately, under § 102(g), "priority of invention 'goes to the first party to reduce an invention to practice unless the other party can show that it was the first to conceive the invention and that it exercised reasonable diligence in later reducing that invention to practice.'"  Mahurkar v. C.R. Bard, Inc., 79 F.3d 1572, 1577 (Fed. Cir. 1996) (quoting Price v. Symsek, 988 F.2d 1187, 1190 (Fed. Cir. 1993)).

The parties agree that if the patent is valid, GTT is entitled to a presumptive invention date of January 7, 1994, the date of the patent application.  See Ecolochem, Inc. v. S. Cal. Edison Co., 227 F.3d 1361, 1371 (Fed. Cir. 2000).  However, the presumption does not foreclose either GTT or Defendants from proving an earlier invention date to establish clear priority.  Mahurkar, 79 F.3d at 1576-77.

GTT initially argued that it was entitled to a finding as a matter of law that its inventors conceived of the '398 invention by December 12, 1992, and reduced it to practice by December 13, 1993.  But, GTT withdrew its request for summary judgment on conception and reduction, opting instead to prove its conception and reduction theories to a jury at trial.  GTT's Reply Br. Supp. Mot. Summ. J. [Docket No. 200] 7.

Defendants argue that as a matter of law, GTT cannot establish an invention date earlier than January 7, 1994.  Defs.' Mem Supp. Summ. J. 15.  However, GTT has presented schematics from its inventors' notebooks from 1992 and 1993, as well as deposition testimony and expert testimony.  At a minimum, this evidence raises disputed material facts that, if a reasonable jury were to credit them, could lead to finding an invention date prior to January 7, 1994.  See Drown

Decl. Exs. 3, 4.  Thus, Defendants' motion for summary judgment on the date of invention is

denied.

> **2.      Genuine Issues of Material Fact Exist Regarding Whether the Gerland
> Paper and the Bradfield Paper are Printed Publications**

"Section 102(a) establishes that a person cannot patent what was already known to

others."  Woodland Trust v. Flowertree Nursery, 148 F.3d 1368, 1370 (Fed. Cir. 1998).  To

qualify as prior art under § 102(a), a reference must have been "known or used by others in this

country, or patented or described in a printed publication in this or a foreign country, before the

invention thereof by the applicant for patent."  To qualify as a printed publication, the reference

must be "publicly accessible" by being "disseminated or otherwise made available to the extent

that persons interested and ordinarily skilled in the subject matter or art exercising reasonable

diligence, can locate it."  Bruckelmyer v. Ground Heaters, Inc., 445 F.3d 1374, 1378 (Fed. Cir.

2006); SRI Int'l, Inc. v. Internet Sec. Sys., 511 F.3d 1186, 1194 (Fed. Cir. 2008) (holding that

paper on FTP website, while publicly available, was not publicly accessible because it was "not

catalogued or indexed in a meaningful way").

Defendants move for a finding that as of March and October 1993, the Bradfield and

Gerland Papers, respectively, were "printed publications" under 35 U.S.C. § 102(a).  GTT seeks

summary judgment in its favor that the Bradfield and Gerland Papers are not printed

publications.

> **a.      Defendants' Insufficiently Supported Motion for Summary Judgment
> Regarding Printed Publications**

Defendants' motion for summary judgment on the Gerland and Bradfield Papers as

"printed publications" under 35 U.S.C. § 102(a) is wholly insufficient.  After summarizing some

of the applicable law, Defendants simply refer the Court to the entire expert report of Scott

Andrews as support for the papers being printed publications.  Defs.' Mem Supp. Summ. J. 18-

19 (citing Andrews' Expert Report).  Andrews' report, a 226-page document, covers numerous

facts and provides many opinions.  Although some disputed evidence comes to light in

Defendants' rebuttal to GTT's motion for summary judgment, Defendants failed in their own

motion to cite facts, such as how the papers were published and how and to whom they were

publicly accessible.  Defendants failed to establish that the Gerland and Bradfield Papers

qualified as printed publications under § 102(a).  The Court cannot grant summary judgment on

this unsupported basis.  See Rodgers v. City of Des Moines, 435 F.3d 904, 908 (8th Cir. 2006)

(holding it is improper to ask the Court to "mine [the] summary judgment record searching for

nuggets").

> **b.     GTT's Motion for Summary Judgment Regarding Printed Publications**

On the other hand, disputed facts also prevent a ruling that the Gerland and Bradfield

Papers are not prior art.[5]

Since patents are presumed valid, there is a heavy burden on Defendants to show

invalidity by Section 102(a).  See Woodland, 148 F.3d at 137.  In Woodland, the Federal Circuit

wrestled with a problem of witness credibility in the face of this heavy burden.  The Court

determined that if a party arguing for invalidity only has "oral testimony of interested persons

---

[5] As discussed above, a prior art analysis will require Defendants to prove that every limitation of the claimed invention is anticipated by the single prior art reference.  GTT does not appear to request summary judgment on the failure of anticipation proof; instead, GTT concentrates on what it alleges is a lack of proof of publication and dissemination.  GTT's Mem. Supp. Mot. Summ. J. 34 (discussing the Bradfield Paper) and 35-37 (discussing the Gerland Paper).

and their friends, particularly as to long-past events," then the appellate court will overturn the district court's ruling of invalidity.[6]  Id.  The absence of corroborating evidence was key to the Federal Circuit's determination.  Id. at 1371-72.

### i.  The Bradfield Paper

In February 1993, Bradfield and Gerland co-authored the Bradfield Paper.  The paper appears to be a marketing document, which Defendants claim GSI, the German company, and its partner Bell Atlantic disseminated to potential clients in the United States.  Defendants claim Bell Atlantic took the Bradfield Paper and made contacts in the United States transit industry to generate sales of the German company's GPS-based TPS system.  Jay Decl. Ex. 17, at 46.  As corroboration for the Bradfield Paper's status as a printed publication and its distribution to the relevant market, Defendants present Gerland's deposition testimony and the research of Harrald Weiss.  Weiss was an electrical engineer and marketing professional who performed "substantial research" on the '398 Patent and the TPS systems of the early 1990's.  Weiss testified about printed brochures and records showing GSI's and Bell Atlantic's efforts to sell its GPS system in the United States.  Id. Ex. 14, at 8-9, 32, 37, 40.  On this evidence, Defendants conclude that the Bradfield Paper was publicly available and "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it", as required by 35 U.S.C. § 102(a).  GTT responds that this evidence is not from independent, unbiased witnesses and that much of this evidence is hearsay.  Defendants' rebuttal is that its deposition testimony is supported by date markings on the Bradfield Paper and by further records discovered by Weiss.

---

[6] The Federal Circuit overturned a district court's ruling on appeal following a full trial.

At this stage of litigation, the two witnesses and their corroborating documents are sufficient to defeat GTT's motion for summary judgment on this issue.  The court will determine admissibility issues at trial, see Celotex, 477 U.S. at 324 (stating that nonmoving party need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment"); see also Fed. R. Civ. P. 56(c).  But based on Defendants' proffer of evidence, and taking the facts in the light most favorable to the non-moving party, GTT is not entitled to summary judgment on this issue.  Yates v. Rexton, Inc., 267 F.3d 793, 800 (8th Cir. 2001) ("[A] district court is prohibited [at summary judgment] from making a credibility judgment or a factual finding from conflicting evidence.").

### ii.       The Gerland Paper

Gerland has testified that in October 1993, he presented the Gerland Paper at the IEEE-IEE Vehicle Navigation Systems Conference in Ottawa, Canada, and that the paper was distributed there.  See Mass. Inst. of Tech. v. Ab Fortia, 774 F.2d 1104, 1109 (Fed. Cir. 1985) (finding paper distributed without restriction and presented at industry conference attended by between 50 and 500 persons interested in the subject matter to be a "printed publication").  However, as discussed above, oral testimony alone is not sufficient to overcome "the clear and convincing evidence standard impose[d] in proving patent invalidity."  Finnigan Corp. v. Int'l Trade Comm'n, 180 F.3d 1354, 1370 (Fed. Cir. 1999).  As with the Bradfield Paper, there is evidence proffered by Defendants that may corroborate publication under §102(a).  Defendants note that the document bears a 1993 copyright mark.  They also offer evidence from the Library of Congress indicating the conference collected the papers presented there and published them.  Gerland testified that, as a result, the Gerland Paper is part of a "publicly available" collection of

proceedings.  As a result, if and when the Gerland Paper became a printed publication recognized under 35 U.S.C. § 102(c) is a disputed fact.  GTT argues that Gerland's testimony is biased and that he is being paid to testify.  They also argue about the admissibility of some of the documentary evidence.  Again, at the summary judgment stage, with facts in dispute, credibility of witnesses and admissibility is a separate inquiry to be resolved at trial.

### c.    Motions for Summary Judgment Regarding Prior Invention

Similar to Defendants' § 102(a) arguments, Defendants assert that claims of the patent are invalid under 35 U.S.C. § 102(g), but Defendants failed to offer undisputed facts regarding prior invention.  In one paragraph, Defendants recite the elements needed to prove prior invention and then conclude that the Cross Invention Memo was conceived no later than May 1993 and was diligently reduced to practice by Econolite, TCC, and Midwest throughout 1993 and 1994.  Defs.' Mem Supp. Summ. J. 19.  But, GTT disputes both the conception date and the theory of diligent reduction to practice.  GTT's Mem. Opp'n Summ. J. 10-14.  GTT cites deposition testimony that supports an alternative theory that Midwest developed its own technology, not based on Cross' Invention Memo.  Id.  Therefore, their motion for summary judgment on this issue is denied.

GTT moves for a ruling that the Cross Invention Memo is not prior art under § 102(g) because, GTT argues, the invention described in the memo was not "reduced to practice." GTT's Mem. Supp. Mot. Summ. J. 37.  However, GTT's arguments are based on disputed facts and assume a too narrow reading of § 102(g).  Defendants' response to GTT's motion for summary judgment is better supported than their own motion for summary judgment, and shows that there are issues for a jury.  Defs.' Mem. Opp'n to GTT's Mot. Summ. J. 31-43.

21

Under § 102(g)(2), "if a patentee's invention has been made by another, prior inventor who has not abandoned, suppressed, or concealed the invention, § 102(g) will invalidate that patent." Apotex USA, Inc. v. Merck & Co., 254 F.3d 1031, 1035 (Fed. Cir. 2001). To qualify as prior art, there must be clear and convincing evidence that the prior invention was reduced to practice. z4 Techs., Inc. v. Microsoft Corp., 507 F.3d 1340, 1352 (Fed. Cir. 2007); Sandt Tech., Ltd. v. Resco Metal & Plastics Corp., 264 F.3d 1344, 1350 (Fed. Cir. 2001) (holding there is a heavy burden to "introduce clear and convincing evidence on all issues relating to the status of a particular reference as prior art").

GTT argues the Cross Invention Memo cannot be prior art because there is no clear and convincing evidence that the Cross Invention Memo was reduced to practice by Cross. GTT's Reply in Supp. Mem. Summ. J. 11. GTT argues that even if Defendants' prior invention story is true, it is legally untenable to claim other companies diligently reduced to practice the inventor's invention. That is, even if Econolite, TCC, and Midwest Traffic reduced the device in the Cross Invention Memo to practice, "under Federal Circuit law [these companies] cannot be 'an inventor' under 102(g)." Id. (citing Solvay S.A. v. Honeywell Int'l, Inc., 622 F.3d 1367, 1378 (Fed. Cir. 2010)). In Solvay, defendant Honeywell "did not have, or formulate, a definite and permanent 'idea' of its own capable of being reduced to practice." Id. at 1377. Instead, Honeywell simply reproduced an invention previously conceived and reduced to practice by a Russian company. Id. GTT argues Solvay stands for the proposition that a company which does not conceive of an invention cannot be an inventor under § 102(g). Solvay's holding is not so broad. The limitation of Solvay's holding is the international character of the interaction. The Court emphasizes that § 102(g)(2) "relates to prior inventorship by another in this country." Id.

at 1375-76 (citing Kimberly-Clark Corp. v. Johnson & Johnson and Personal Prods. Co., 745 F.2d 1437, 1444 (Fed. Cir. 1984).  Therefore, the fact that Honeywell did not conceive of the invention, but took the invention from an international contractor, became relevant in that case.

The context of the Cross prior invention theory is entirely domestic.  Cross and Weiss testified that the Cross Invention Memo reflected the conception of the idea.  Defendants argue that correspondence between Cross, Econolite, and Midwest Traffic show that they worked together and were diligent about reducing the technology to practice.  This is not a case where a company took the invention of an international contractor and passed it off as its own.  Cross claims he wrote his memo in May 1993, and, although the reduction to practice went beyond GTT's patent application date of January 1994, Defendants claim that they were diligent in reducing Cross' invention to practice protected by Patent '113 in May, 1995.  Whether Cross and STC, as the primary manufacturer of Emtrac Systems, and the reducing companies were diligent about reducing the invention to practice is a fact question still in dispute.  Finally, it is unclear whether the device commercialized by Midwest and patented under Patent '113 will prove to be a prior invention.  There are simply too many disputed issues to dispose of Defendants' § 102(g) defense on summary judgment.

### d.    Evidentiary Issue

The resolution of publication issues has been procedurally complicated by Defendants' late responses to interrogatories that specifically asked how Defendants contend the Bradfield and Gerland Papers satisfy 35 U.S.C. § 102(a).  GTT requests, under Rule 37(c)'s exclusion provisions, that Defendants be precluded from supporting the Gerland and Bradfield Papers with corroborating Copyright Office, digital library, and Library of Congress evidence disclosed for

the first time in their opposition brief.  See Fed. R. Civ. P. 37(c).  Although this corroborating

evidence arrives in rebuttal rather than in Defendants' affirmative posture, GTT has not shown

how it was prejudiced by the delay of evidence.  Defendants timely shared the Gerland Paper,

which has a 1993 copyright mark and which references the relevant vehicle navigation systems

conference in Ottawa, Canada.  Jay Decl. Ex. 20.  In addition, Gerland was deposed about the

timing of the conference well before the end of the discovery period.  The Bradfield Paper also

has a date, February 1993, affixed to the document.  Id. Ex. 18.  GTT has challenged these dates

and the supporting deposition testimony, but Defendants' disclosure has been sufficient to satisfy

Rule 26(e) notice requirements, as sufficient facts were "made known to the other parties during

the discovery process . . ."  Fed. R. Civ. P. 26 (e).  Therefore, Rule 37(c) exclusion is

inappropriate in this case.

>   **3.      Genuine Issues of Material Fact Exist About Whether Anticipation Defenses
>            Cover Asserted Claims**

Anticipation defenses under 35 U.S.C. § 102 typically raise a question of fact.

ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc., 694 F.3d 1312, 1327 (Fed. Cir. 2012).

To prevail at trial, Defendants must prove by clear and convincing evidence that prior art

references disclose each and every element of the asserted claims.  K-Tec, Inc. v. Vita-Mix

Corp., 696 F.3d 1364, 1377 (Fed. Cir. 2012).  At summary judgment, GTT must show that

Defendants have no evidence that could lead a reasonable jury to find in Defendants' favor.

GTT's argument that Defendants' anticipation defenses fail, rests entirely on their

position that the Bradfield and Gerland Papers are not prior art.  GTT's Br. Supp. Mot. Summ. J.

40.  As already discussed above, the facts surrounding the Bradfield and Gerland Papers are

contested and summary judgment against the prior art status of the Bradfield and Gerland Papers is not appropriate.

In a separate argument, GTT asserts that Defendants' '434 Patent cannot be used to anticipate any of GTT's '398 Patent claims because of a settled issue of claim construction.  Id. GTT argues that since Defendants' expert Scott Andrews conceded that the "navigation means" of Claim 1 of the '398 Patent at least includes a "GPS receiver," and since the '434 Patent does not disclose a GPS receiver, it cannot anticipate Claim 1.  Id. (citing Drown Decl. Ex. 22, at 322).  Defendants interpret their expert's opinion differently.  Defendants argue Andrews, in response to  a hypothetical question, answered that if "navigation means" necessarily requires GPS, then the '434 Patent does not include navigation means.  However, if "navigation means" may refer to other devices as well, then the '434 Patent may anticipate the '398 Patent. Defendants' interpretation of their expert witness's statement is not facially unreasonable and creates a fact question for the jury.  Therefore, summary judgment for GTT on the issue of '434 Patent anticipation is denied.

### 4.      Laches Does Not Preclude GTT's Claims

Defendants argue GTT impermissibly delayed suing Defendants, entitling them to dismissal of the suit on the equitable grounds of laches.

Laches is an affirmative defense that requires a defendant to prove: (1) that the plaintiff delayed filing suit an unreasonable and inexcusable length of time after the plaintiff knew or reasonably should have known of its claim against the defendant; and (2) the delay resulted in material prejudice or injury to the defendant.  Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.,

60 F.3d 770, 774-75 (Fed. Cir. 1995).  Laches is an equitable defense within the discretion of the court.  <u>A. C. Aukerman Co. v. R. L. Chaides Constr. Co.</u>, 960 F.2d 1020, 1032 (Fed. Cir. 1992).

Defendants argue the laches clock started ticking when GTT learned that GPS was used to enhance an Emtrac System in 2004 or 2005.  GTT responds the clock started to run in 2007 when Defendants began selling the Emtrac GPS System accused of infringement.  GTT says that earlier Emtrac systems, even the ones that used a GPS compass, did not infringe the '398 Patent.  If Defendants did not infringe the patent until 2007, three years is not an unreasonable time in which to consider whether or not to bring suit.  The factual disputes underlying the laches argument, discussed above, preclude summary judgment.

### 5.    Outstanding Markman Hearing Issues

Defendants invite the Court to construe numerous claim terms not raised at the Markman hearing.  <u>See</u> Defs.' Mem. Supp. Summ. J. 21-31.

It is the court's role to construe claims, while it is the jury's role to determine infringement.  <u>Markman v. Westview Instruments</u>, 517 U.S. 370, 384 (1996).  However, <u>Markman</u> gives little guidance on the precise procedure or the timing  for claim construction.  United States District Courts have largely conducted claim construction when and in a manner fitting the particular cases before them.  To name only a few options, Markman hearings have been deemed unnecessary where the paper record suffices and the disputed term is unambiguous and not highly technical.  <u>See</u> <u>Revlon Consumer Prods. Corp. v. Estee Lauder Cos., Inc.</u>, No. 00 Civ. 5960 RMB AJP, 2003 WL 21751833, at *14 (S.D.N.Y. July 30, 2003).  Markman hearings have been conducted prior to discovery.  <u>See</u> <u>Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.</u>, 200 F. 2d 795 (Fed. Cir. 1999).  And Markman hearings have been held after discovery, between

discovery and expert reports, after expert reports, in conjunction with summary judgment, at trial, and after trial in preparation for giving jury instructions.  See e.g., MacNeill Eng'g Co. v. Trisport, Ltd., 126 F. Supp. 2d 51, 55 (D. Mass. 2001); Thomson Consumer Elecs. v. Innovatron, S.A., 43 F. Supp.2d 26 (D.D.C. 1999); Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1580 (Fed. Cir. 1996); Laitram Corp. v. NEC Corp., 62 F.3d 1388, 1394 (Fed. Cir. 1995).  In sum, District Courts have the flexibility to manage the timing of claim construction given the development of their case.

In this case, the Court required the parties to meet and confer regarding disputed claim terms before producing expert reports.  On December 13, 2011, the parties filed a Joint Claim Construction Statement [Docket No. 74].  GTT did not designate any claim terms as needing construction, arguing that all terms should have their plain and ordinary meaning.  Emtrac, on the other hand, initially designated 26 claim terms as needing construction.  Three months later, on November 28, 2011, following a delay to allow Emtrac to find new counsel, Emtrac provided GTT with constructions for only 7 of the 26 claim terms it had previously identified as needing construction.  Emtrac later added one more claim term for construction that it had not identified earlier ("an intersection module associated with an intersection . . .").

A Markman hearing was held May 30, 2012.  In the Order of July 13, 2012, the Court construed 6 disputed terms from the Joint Claim Construction Statement, plus one more term that was not raised until Defendants' Opening Claim Construction Brief.[7]  Global Traffic Techs., LLC v. Emtrac Sys., Civ. No. 10-4110, 2012 U.S. Dist. LEXIS 96866 (D. Minn. July 13, 2012).

---

[7] At the Markman hearing, Emtrac withdrew its request for the Court to construct the term "intersection."

The disputed terms were: (1) "associated with the location"; (2) "mapping means, associated with the location, for storing a plurality of positions corresponding to allowed approaches to the location and providing therefrom a map of allowed approaches"; (3) "map of allowed approaches"; (4) "associated with the/a vehicle"; (5) "associated with the/an intersection"; (6) "transmitting (the) vehicle data"; and (7) "an intersection module associated with an intersection and adapted to track the vehicle path, the intersection module comprising."  For each term, Defendants suggested placing location-specific limitations on the terms which would narrow the scope of the patent coverage.  See id.  For example, Defendants suggested that "intersection module" should be construed as located at the intersection.  Instead, the Court determined that following plain meaning, the "intersection module" describes what the module is "associated with," not its precise location.  The Court determined that each term is entitled to its plain meaning and rejected Defendants' proposed limitations.[8]  Id.

Now, at the summary judgment stage, Defendants argue for nine limitations on claim terms, including "navigation means"; "vehicle data"; "vehicle path"; "means for transmitting vehicle data"; "means, associated with the location, for receiving vehicle data"; "evaluation means"; "intersection module"; "associated with the location"; and "adapted to track the vehicle path."  Some of Defendants' limitation arguments are repeated from the Markman hearing and others are raised for the first time.

---

[8] Only the second disputed claim term needed further analysis because "mapping means . . . for" is in means-plus-function form.  The function is plain: "storing a plurality of positions corresponding to the location and providing therefrom a map of allowed approaches."  '398 Patent 9:37-40.  The structure is "computer map memory."  No physical location of the "computer map memory" is relevant to performing the twin functions of storing positions and providing a map of allowed approaches.

Federal Rule of Civil Procedure 37 requires that "[i]f a party fails to provide information, . . . the party is not allowed to use that information . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Rule 16 grants courts the authority to set management deadlines and impose sanctions, such as exclusion, when those deadlines are violated. Fed. R. Civ. P. 16(b), (f). Courts have routinely excluded arguments and evidence raised at a "late stage of the proceedings." ELCA Enters. v. Sisco Equip. Rental & Sales, Inc., 53 F.3d 186, 190 (8th Cir. 1995) (finding that because "parties must provide clear and accurate responses to discovery requests," a party's "eleventh hour attempt to switch the basis for its alleged damages" was properly excluded); see also Innogenetics, N.V. v. Abbott Labs., 512 F.3d 1363, 1376 n.4 (Fed. Cir. 2008) (finding even evidence submitted in technical compliance with the prior art requirements of 35 U.S.C. § 282 to be excludable when the late disclosure "stripped [the opposing party] of any meaningful opportunity to prepare an adequate cross-examination of the reference.").

Defendants have previously been admonished for tardily raising claim construction arguments. Global Traffic Techs., 2012 U.S. Dist. LEXIS 96866, at *19-20. And yet, instead of requesting a further Markman hearing, Defendants insert these arguments in a summary judgment motion as if they were undisputed material facts entitling them to summary judgment as a matter of law. Trying to raise claim construction arguments by throwing them "over the transom" in this way is inappropriate. The failure to raise these claim construction disputes prior to the Markman hearing is unjustified and prejudices GTT.

Although refusing to construe the new claims may be one possible sanction under Rule 16(b) and (f) for violation of Rule 37, a further Markman hearing is also an alternative if genuine

disputes about claim construction still exist and if there is good cause for the delay in raising the issue.  On the record before the Court, experts have now had the opportunity to examine the patent and the Accused Product.  The summary judgment briefs and expert reports suggest that the parties' experts are ready to dispute every claim and every term, as well as the application of those terms to the Accused Product.  The experts even disagree on what constitutes "a person of ordinary skill in the art."  See Andrews Expert Report 14.  The Court will not construe further claims at this time but will await the context of the trial to discern whether there are additional claim constructions germane to the contested issues at trial.

### 6.     Genuine Issues of Material Fact Exist Regarding Whether the Accused Product Infringes the '398 Patent

Determining infringement requires two steps: (1) the claim must be properly construed to determine its scope and meaning; and (2) the construed claim must be compared to the accused device.  Applied Med. Res. Corp. v. U.S. Surgical Corp., 448 F.3d 1324, 1332 (Fed. Cir. 2006).  "To prove infringement, the patentee must show that the accused device meets each claim limitation either literally or under the doctrine of equivalents."  Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc., 289 F.3d 801, 812 (Fed Cir. 2002) (citation omitted).  "Literal infringement of a means-plus-function claim limitation requires that the relevant structure in the accused device perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification."  Applied Med. Res., 448 F.3d at 1333 (citation omitted).  An "equivalent" structure in an accused device is one that performs the identical function in substantially the same way with substantially the same result as the structure disclosed in the specification.  Id.  Infringement, whether literal or under the doctrine of

equivalents, is a question of fact.  Bai v. L & L Wings, Inc., 160 F.3d 1350, 1353 (Fed. Cir. 1998).

Defendants have moved for summary judgment that the Emtrac System does not directly or indirectly infringe any valid asserted claim of the '398 Patent.  Defendants have the initial burden to demonstrate an absence of a genuine issue of material fact.  MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp., 420 F.3d 1369, 1373 (Fed. Cir. 2005).  Again, judges are not responsible for hunting through the record to search for evidence that will support Defendants' motion.  United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991); accord Crossley v. Georgia-Pacific Corp., 355 F.3d 1112, 1114 (8th Cir. 2004).  Defendants attempted to incorporate the entire record in a footnote, claiming to "hereby move for summary judgment on all grounds of alleged non-infringement including those set forth in their non-infringement contentions (Ex. 39) and the Rebuttal Report of Andrews (Ex. 40), including those not expressly mentioned herein."  Defs.' Mem Supp. Mot. Summ. J. 21 fn. 5.  Defendants may not rely on this broad definition of their grounds for their motion, but instead must direct the Court to the evidence and explain how it supports their argument.  The contradictory testimony of the parties' experts are but one area where fact issues of infringement abound.

**7.     Genuine Issues of Material Fact Exist Regarding Alleged Indirect Infringement and Willful Infringement of the '398 Patent**

Defendants seek summary judgment in their favor, arguing that GTT cannot prove indirect and willful infringement.  Indirect infringement falls into two categories, induced infringement and contributory infringement.  First, "[w]hoever actively induces infringement of a patent shall be liable as an infringer."  35 U.S.C. § 271(b).  GTT claims Defendants induced customers to infringe the '398 Patent.  The elements of inducement are: (1) direct infringement

by the third party; (2) the inducer's "knowledge of acts alleged to constitute infringement"; and (3) the inducer's "specific intent and action to induce infringement." <u>DSU Medical Corp. v. JMS Co. Ltd.</u>, 471 F.3d 1293, 1305-06 (Fed. Cir. 2006) ("instructing how to engage in an infringing use . . . show[s] an affirmative intent that the product be used to infringe").  Second, "[c]ontributory infringement imposes liability on one who embodies in a non–staple device the heart of a patented process and supplies the device to others to complete the process and appropriate the benefit of the patented invention." <u>Vita-Mix Corp. v. Basic Holding, Inc.</u>, 581 F.3d 1317, 1327 (Fed. Cir. 2009).  To establish contributory infringement, a plaintiff must show that: (1) there is direct infringement; (2) the accused infringer had knowledge of the patent; (3) the component has no substantial non-infringing uses; and (4) the component is a material part of the invention. <u>Fujitsu Ltd. v. Netgear Inc.</u>, 620 F.3d 1321, 1326 (Fed. Cir. 2010).  Third, to "willfully infringe a patent, the patent must exist, and one must have knowledge of it." <u>State Indus., Inc. v. A.O. Smith Corp.</u>, 751 F.2d 1226, 1236 (Fed. Cir. 1985).  Furthermore, "to establish willful infringement, a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." <u>In re Seagate Tech., LLC</u>, 497 F.3d 1360, 1371 (Fed. Cir. 2007).  And finally, an individual defendant can be personally liable for inducing others to infringe.  "[C]orporate officers who actively assist with their corporations' infringement may be personally liable for inducing infringement regardless of whether the circumstances are such that a court should disregard the corporate entity and pierce the corporate veil." <u>Worldtech Sys. v. Integrated Networks Solutions, Inc.</u>, 609 F.3d 1308, 1316 (Fed. Cir. 2010).

32

Defendants argue GTT's indirect infringement allegations are insufficiently pled because GTT failed to allege any specific facts demonstrating knowledge of the '398 Patent and failed to allege any specific intent.  GTT counters that Morgan testified that he knew of the existence of a 3M patent related to GPS technology, and that he and Brad Cross discussed the patent.  Morgan Dep. 148-49, 150.  But, Defendants argue GTT misstates Morgan's testimony because Morgan only testified that he was generally aware of a patent and did not know specifically of the '398 Patent.  GTT also notes Morgan's testimony that he "made the decision not to look at their patent, and we could have."  Id. at 151:14-17.  Finally, although Morgan's and Cross' relationship with the involuntarily dissolved Emtrac Systems, Inc., KME, and STC is unclear, Emtrac systems were sold to many cities around the United States and abroad, and Morgan at least acted to install, train, and demonstrate how the Emtrac systems worked.  Id. at 180-187.  The dispute about the depth of Defendants' knowledge of the '398 Patent raises genuine issues of material fact.  Defendants have not offered undisputed evidence that Morgan should not be held personally liable for his actions in selling the Emtrac systems, in his capacity working for Emtrac Systems, Inc. and KME.

### 8.      Genuine Issues of Material Fact Exist About Whether GTT Failed to Comply with the Patent Marking Statute

Unless and until the patentee marks his patent or serves actual notice upon an alleged infringer he can recover no damages.  35 U.S.C. § 287(a); Am. Med. Sys. v. Med. Eng'g Corp., 6 F.3d 1523, 1537 (Fed. Cir. 1993).  Section 287(a) is intended to "give notice to the public" that a product is patented.  Notice to the public can be given by either marking the product itself, or when "from the character of the article, this cannot be done" by marking "the package" of the patented product.  35 U.S.C. § 287(a).  To comply with the requirement of constructive notice, a

patentee must consistently mark substantially all of the patented products, and cease marketing unmarked products.  Heraeus Electro-Nite Co. v. Midwest Inst. Co., 2007 WL 3407128, at *3 (E.D. Penn. Nov. 14, 2007) (citing, Am. Med. Sys., 6 F.3d at 1538).  The patentee bears the burden of proving compliance with section 287(a) by a preponderance of the evidence.  Nike Inc. v. Wal-Mart Stores, 138 F.3d 1437, 1446 (Fed. Cir. 1998).

Defendants argue GTT cannot prove compliance with the patent marking statute because, although GTT's product is a tangible good with adequate space on the exterior, GTT only marks its packaging, not the product.  GTT argues that marking the packaging was the most effective method of giving notice to the public because the multiple components, when in use, are hidden from public view—for example, components of the Opticom GPS System are affixed to street lights, locked inside electrical boxes, or in emergency vehicles.  Courts that have considered the issue have split between a "highly literal reading" of the marking statute's requirements and a more "practical approach."  Stryker Corp. v. Zimmer Inc., 2012 WL 6821683, at *3 (W.D. Mich. Nov. 29, 2012); Heraeus, 2007 WL 3407128, at *4 (collecting cases where marking of packaging sufficed to satisfy the patent marking statute).  It appears the law is in dispute.  The Eighth Circuit has not considered the question and the Federal Circuit has not indicated a preference.  As Defendants have noted, "in each case where patented articles were not marked, the courts considered the specific circumstances dictating why alternative marking was justified by factors including practicality of use, necessity, and/or the effectiveness of notice."  Defs.' Reply Mem. Supp. Mot. Summ. J. 14 (citing, see e.g. Stryker, 2012 WL 6821683, at *4-11 (marking on packaging allowed in order to maintain sterility and safety); Bowling v. Hasbro, Inc., 490 F. Supp. 2d 262, 276-77 (D.R.I. 2007); and Chicago Pneumatic Toll Co. v. Hughes

Tool Co., 192 F.2d 620 (10th Cir. 1951) (large cone drills for deep well drilling not marked due to impracticality)).  Whether marking on the packaging served as the most effective notice to the public of this product, given its multiple and hidden components, is a fact issue for trial.

>    **9.**    **GTT is Entitled to Summary Judgment on KME's Advertising Claims**

Defendants claim GTT has violated the Lanham Act, 15 U.S.C. § 1125, by falsely advertising and representing Defendants' Emtrac Priority Control System as GTT's Opticom GPS System.  KME Compl. ¶ 81.  Defendants also bring two claims under state law, the Minnesota False Statement in Advertising Act ("MFSAA"), Minn. Stat. § 325F.67 et seq., and the Minnesota Deceptive Trade Practices Act ("MDTPA"), Minn. Stat. § 325D.44 et seq. (collectively, Defendants' "Advertising Claims").  These claims all relate to two "advertisements," a press release and a web video.

KME's advertising claims require evidence on each of the following essential elements: (1) GTT made a false statement of fact in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) GTT caused its false statement to enter interstate commerce;[9] and (5) Defendants have been or are likely to be injured as a result of the false statement.  Aviva Sports, Inc. v. Fingerhut Direct Mktg., 829 F. Supp. 2d 802, 808-09 (D. Minn. 2011) (citing United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1180 (8th Cir. 1998)).

---

[9] The same analysis generally applies to the Lanham Act, the MFSAA, and MDTPA claims, Fair Isaac Corp. v. Experian Info. Solutions, 645 F. Supp. 2d 734, 756 (D. Minn. 2009), but the interstate commerce requirement under the Lanham Act is not required under the Minnesota statutes, Buetow v. A.L.S. Enters., Inc., 713 F. Supp. 2d 832, 837, n. 4 (D. Minn. 2010).

There are two categories of false statements: (1) commercial claims that are literally false as a factual matter; and (2) claims that may be literally true or ambiguous but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers. Id. at 811. Under the Lanham Act, it is typically the burden of the party seeking relief, here Defendants, to prove actual deception by using consumer or market research. Id. at 813. But if the statement is literally false, it may relieve the claimant of the burden to prove consumer deception. Buetow, 650 F.3d at 1185. However, the standard for literal falsity is rigorous, and "[w]hen an ad can reasonably be understood as conveying different messages, [a] literal falsity argument must fail." Id. (internal quotations omitted).

First, KME declares a particular GTT internet video is false advertising. Drown Decl. Ex. 12. The video, about seven minutes long, is instructional in tone. Id. For the first half, a narrator generically describes TPS while "live" images of traffic, buses, and emergency vehicles are displayed. Id. In the second half, GTT uses animation to show exactly how their Opticom GPS System works. In the "live" portion of the video, the buses pictured are Minneapolis Metro Transit buses. Defendants argue that Opticom's GPS System was never installed on Minneapolis buses, proving that the video is literally false.[10] But, if GTT was using images of Minneapolis buses simply as proxies for buses in general, then the video would not be literally false. GTT's narrator never mentions Minneapolis and never touts the Opticom GPS System as the system in use by Minneapolis buses. Instead, the images serve as stock images of buses and traffic where a TPS system may be useful. Therefore, KME's claim cannot receive the

---

[10] Minneapolis became a customer of KME in 2009. Defs.' Mem Opp'n to GTT's Mot. Summ. J. 4.

presumption of consumer deception that literal falsity would confer.  Without the presumption of

literal falsity, KME is required to provide evidence of consumer deception.  Since KME has not

offered any evidence of consumer deception, KME is missing an essential element of a false

advertising claim.  Thus, GTT is entitled to summary judgment on KME's first false advertising

claim.

Second, KME cites an e-mail newsletter as misleading and false advertising.  The

newsletter stated: "For more than 35 years [GTT], the innovator of Opticom priority control

solutions, has provided reliable traffic management . . . ."  GTT notes that the 3M business unit,

Intelligent Transportation Systems, responsible for the Opticom product line was divested in

2007 as part of an asset purchase agreement and became GTT; therefore, 3M's know-how,

experience, and business regarding the Opticom product line is now GTT's.  Defendants

maintain that the newsletter is literally false because GTT did not exist 35 years ago.  Legally, if

GTT is a continuation of 3M's Intelligent Transportation Systems unit, and if GTT retains the

experience of 3M, then the ad is not literally false because GTT's experience incorporates 3M's.

Even if the newsletter is misleading, KME is required again to provide evidence of consumer

deception.  KME has not done so.  In addition, for both advertising claims, KME did not present

evidence of materiality or injury.  Thus, GTT is entitled to summary judgment on KME's second

false advertising claim.

### 10.    GTT is Entitled to Dismissal of KME's Tortious Interference Claims

To prove a party has tortiously interfered with prospective contractual relations KME

must show that GTT intentionally and improperly interfered with KME's prospective contractual

relations by: (1) inducing or otherwise causing a third person not to enter into or continue the

prospective relation or, (2) preventing the other from acquiring or continuing the relation.  Auto-Chlor Sys. v. JohnsonDiversey, 328 F. Supp. 2d 980, 1013 (D. Minn. 2004).  If proven, GTT is "subject to liability to the other for pecuniary harm resulting from the loss of benefits of the relation."  Id.  KME must present admissible evidence that specific facts exist creating a genuine issue of material fact for trial.  Id. at 1014.

> a.      **KME's Complaint**

KME alleges GTT engaged in tortious interference with KME's prospective contractual relations.  First, KME avers GTT issued a misleading press release, October 1, 2010, which was intended to scare off KME's clients by announcing its suit against Emtrac Systems, Inc. and by informing the public that the law firm representing it had recently won a suit in a similar case.  KME Compl. ¶¶ 100-105.  Second, KME avers, GTT contacted KME's current and prospective customers and distributors and told them that GTT would win its suit against Emtrac and that GTT would put Emtrac out of business.  Id. at ¶107.

First, GTT argues there is no evidence to support any element of tortious interference.  As to the press release, KME responds by referring the Court to its Complaint, paragraphs 38 to 48, without further explanation.  Defs.' Mem. Opp'n to GTT's Mot. Summ. J. 9.  KME essentially rested its arguments on the text of its Complaint, which reveals allegations, but it does not recite evidence of every necessary element.  For example, there are no facts presented of GTT's intention to mislead, nor is there evidence that any client was actually misled, and finally, there is no evidence of KME's harm.  KME's press release claim fails to present disputed facts of the elements.

Second, KME alleges GTT threatened its current and prospective clients.  As evidence supporting the interference claim based on threat, KME answered an interrogatory by stating, Econolite of Canada informed Kris Morgan that GTT representatives or distributors, including but not limited to Frank Rao, told representatives of the cities of Spruce Grove and Waterloo, Canada that GTT would win the patent infringement case it filed against KME-Related Parties, and that if the cities purchased Emtrac equipment they might face liability.  Drown Decl. Ex. 9 ("Supplemental Answers to First Set of Interrogatories") 16.  GTT argues that this multiple hearsay statement cannot support a tortious interference claim, particularly because Frank Rao is not a GTT employee.  Again, KME has not offered a defense of its Complaint in the form of proof of the elements. In its response to GTT's argument, KME declined to defend the hearsay statement.  KME also failed to respond to GTT's arguments that KME has presented no evidence of intention or of harm.

### b.    KME's New Allegations

Under the liberal pleading standard Rule 8 of the Federal Rules of Civil Procedure, the purpose of an affirmative pleading is to provide the opposing party fair notice of the nature and basis or grounds for a claim.  N. States Power Co. v. Fed. Transit Admin., 358 F.3d 1050, 1056-57 (8th Cir. 2004); see also, Rodgers, 435 F.3d at 909-10.  A plaintiff does not plead a claim for relief by simply providing "labels and conclusions" or mere "notice of the nature of the claim, . . . ." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 556 n.3 (2007).  Fair notice and grounds on which the claims rest is minimally necessary. "A district court is not required to divine the litigant's intent and create claims that are not clearly raised, and it need not conjure up unpled

allegations to save a complaint." Gregory v. Dillard's, Inc., 565 F.3d 464, 473 (8th Cir. 2009) (internal quotation omitted).

KME made a sweeping allegation in its Complaint that unnamed clients informed KME that they may pull their contract from KME and/or give their prospective business to GTT. KME Compl. ¶ 113.  KME brought its suit in November, 2010.  On May 18, 2012, GTT asked KME by Interrogatory Nos. 31-34, for the factual basis for its advertising and tortious interference claims.  Jay Decl. Supp Defs.' Resp. [Docket No. 177] Ex. CC.  KME responded that on June 1, 2012, two weeks before its answers to Interrogatory Nos. 31-34 were due, and six weeks before the close of discovery, KME had elicited testimony from a City of St. Paul engineer Brian Vitek about GTT's interference with a prospective contractual relationship, including that "GTT exercised improper influence over the City of St. Paul regarding its decision made in 2009 or 2010 to purchase GTT's multi-mode pre-emption system  . . . ."  On July 5, 2012, KME deposed two representatives of the City of West Carrollton, Ohio and elicited testimony that the city worked with GTT on submitting an application for federal grant money and crafting bidding specifications.  KME alleges that this conduct is collusion.  KME argues that its tortious interference claim must be permitted to survive based on this evidence that KME has uncovered during discovery.  KME has not asked to amend its complaint, arguing that its broad allegation is sufficient.

KME's broad allegation in the Complaint is not sufficient by itself.  KME's new allegations are based on a different factual background than that asserted about prospective clients in claims KME has now abandoned.  KME's new allegations about business in St. Paul and West Carrollton, have arrived in the case only in response to GTT's motion for summary

judgment.[11]  The contracts in St. Paul and West Carrollton are not related to GTT's press release, nor are they related to the hearsay statement.  Instead, they are new, independent grounds for claims.

Given the late discovery of these allegations and given their independent grounds, fairness dictates dismissal of these new unpled allegations.

## C.  Motion to Exclude Testimony of Dean Thomson

GTT's Motion to Exclude Testimony is moot.  Defendants hired Dean Thomson to opine on the public bidding process in support of their tortious interference claims.  No viable tortious interference claims remain; therefore, Thomson's expert testimony is no longer relevant to issues remaining in the case.

## D.  Motion to Exclude Testimony of Damages Expert Donald Gorowsky

Each party has retained an expert to opine on the proper measure of damages if infringement is ultimately found.  Defendants have moved to exclude GTT's damages expert.  Rule 702 of the Federal Rules of Evidence governs the admission of expert testimony.  Under Rule 702, an expert may testify if: (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact understand the evidence or determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and, (4) the expert has reliably applied those principles and methods to the facts of the case.  Therefore, district courts faced with a proffer of expert scientific testimony

---

[11] KME served GTT with what it called an "expert report" from a lawyer, Dean Thomson.  The "expert" did no independent research.  Rather, Thomson simply came to a legal conclusion that if facts were as KME presented them, then there would be tortious interference.  The expert report names several more cities in which GTT allegedly interferred, according to KME.

must make a preliminary assessment of "whether the reasoning or methodology underlying the testimony is scientifically valid," and "whether that reasoning or methodology properly can be applied to the facts in issue." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592-93 (1993).

A court must exclude expert testimony if it is "so fundamentally unreliable that it can offer no assistance to the jury." Meterlogic, Inc. v. KLT, Inc., 368 F.3d 1017, 1019 (8th Cir. 2004). Daubert and its progeny "provide[] a district court with the discretion necessary to close the courtroom door to 'junk science' and to admit reliable expert testimony that will aid the trier of fact." Robinson v. GEICO Gen. Ins. Co., 447 F.3d 1096, 1100 (8th Cir. 2006) (citation omitted); see also Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) (district courts are not required "to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert" and may conclude that there is "simply too great an analytical gap between the data and the opinion proffered"). On the other hand, the district court's "focus of course, must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595. The preferred way to challenge an expert is "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof," not exclusion of the expert. Id. at 596.

Gorowsky's credentials are not questioned in this motion, but Defendants aver that his testimony is based on insufficient facts, that his testimony is the product of unreliable principles and methods, and that he has unreliably applied those principles and methods to the facts of the case.

### 1. Lost Profits Opinion

In general, to "recover lost profits, the patent owner must show 'causation in fact,' establishing that 'but for' the infringement, he would have made additional profits." Grain Processing Corp. v. Am. Maize-Products Co., 185 F.3d 1341, 1349 (Fed. Cir. 1999).  But, "[i]n proving his damages, the patent owner's burden of proof is not an absolute one, but rather a burden of reasonable probability."  Lam, Inc. v. Johns-Manville Corp., 718 F.2d 1056, 1065 (Fed. Cir. 1984).

Defendants claim Gorowsky's lost profit opinion ignores the "law of price elasticity of [consumer] demand," because he assumes that all customers who bought KME's Emtrac GPS System in the relevant time period (2007-present) would have bought GTT's Opticom GPS System at GTT's prices, "but for" KME's infringement.  Defendants contend that the analytical gap is too great between the facts and the analysis to allow Gorowsky to testify.  They argue GTT's expert should be precluded from finding price inelasticity, the basis of Gorowsky's "lost profit from price erosion" analysis, and he should also be precluded from finding a two-supplier market, the basis for Gorowsky's "lost profit from sales" analysis.  Defendants argue some of these customers may not have bought a GPS System, or one of GTT's products at GTT's prices in the hypothetical absence of KME's presence in the market.

KME's arguments about price elasticity and price erosion are appropriate to pursue both through its own damages expert and by cross-examining Gorowsky.  They are not a basis to disqualify Gorowsky from testifying.

Gorowsky's expert opinion followed the appropriate methodology and principles.  First Gorowsky defined the relevant market as the market for "GPS-based traffic preemption

equipment for emergency and transit vehicles."  Drown Decl. Supp. GTT's Opp'n to Mot. to

Exclude [Docket No. 167] Ex. 1 ("Gorowsky Expert Report"), at 16, 24.  Having defined the

market, Gorowsky next determined that GTT and Emtrac were the only "viable competitors" in

that market.  Id. at 24-25.  Gorowsky based this determination on the testimony of Defendants'

witnesses, on interviews with customers participating in the market, and on testimony from GTT

employees.  Id. at 25-29.  Defendants claim Gorowsky ignored the presence of other competitors

when he treated the market as involving only two players.  Defendants cite two instances, bids in

Minneapolis, Minnesota, and Brampton, Ontario, in which Emtrac won a contract, GTT did not

bid at all, and other competing companies submitted bids for the TPS projects.  Defs.' Mem.

Supp. Mot. Exclude Gorowsky 14, 21.  Gorowsky considered possible competitors, but

concluded that these competitors hadn't successfully entered the market and "have only rarely

sold products, if ever."  Gorowsky Expert Report at 29.  The Federal Circuit has approved

rejection of a supplier "because of testimony that it only rarely sold" the product at issue.

Gyromat Corp. v. Champion Spark Plug Co., 735 F.2d 549, 554 (Fed. Cir. 1984).  Defendants'

arguments that viable third-party competitors existed is best treated as impeachment evidence.

Gorowsky proposes to offer testimony to assist the jury in calculating lost sales, lost

profits, and possible price erosion.  Gorowsky used accepted methods and principles to analyze

lost sales.  Gorowsky used a two supplier market methodology demonstrated in Lam, 718 F.2d

1056, and also a separate methodology demonstrated in Panduit Corp. v. Stahlin Bros. Fibre

Works, 575 F.2d 1152 (6th Cir. 1978) ("the Panduit test"), to determine lost profits.  Finally,

Gorowsky used a method approved in Ericsson v. Harris Corp., 352 F.3d 1369, 1378 (Fed. Cir.

2004) to analyze price erosion.  To the extent that Defendants disagree with his methodology or conclusions, they can challenge Gorowsky at trial.

### 2. Reasonable Royalty Rate

A reasonable royalty rate may also compensate a patent holder for infringing sales. Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1324 (Fed. Cir. 2009).  To calculate a reasonable royalty rate, an expert considers a "hypothetical negotiation" which "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began."  Id.  An expert may use the multi-factored framework set forth in Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), to evaluate and determine a reasonable royalty.  One factor considered under Georgia-Pacific is "the rates paid by the licensee for the use of other patents comparable to the patent in suit."  Id.

Defendants contend Gorowsky ignored several "fundamental licensing terms" that should have been considered when calculating a reasonable royalty.  Defendants assert Gorowsky failed to consider the value of factors such as foreign patent protection, know-how, exclusivity, and rights to improvements.  Defendants further criticize Gorowsky's expert report for basing his reasonable royalty rate opinion "upon a single interview" with GTT's former President, Richard Sasche.

Gorowsky did not rely on a "single conversation" in his analysis of a reasonable royalty. He considered all fifteen factors of the Georgia-Pacific method in a detailed portion of his report. Gorowsky Expert Report, at 62-73.  The interview he conducted with GTT's former President helped him create one part of the hypothetical licensing scenario required by Georgia-Pacific and

provided proper context for one piece of the multi-factor analysis.  Gorowsky, in accordance

with his understanding of Georgia-Pacific, also considered the hypothetical license's territory,

exclusivity, and any know-how or improvements Defendants might provide.  Drown Decl. Supp.

Gorowsky Expert Report, at 65-66, 72.  To the extent Defendants take issue with Gorowsky's

conclusions and analysis, they may challenge him during cross-examination and in the

presentation of their own expert.

## IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.  Defendants' Motion for Summary Judgment [Docket No. 123] is **DENIED**;

2.  Plaintiff's Motion for Summary Judgment [Docket No. 126] is **DENIED** as to the
    patent issues;

3.  Plaintiff's Motion for Summary Judgment [Docket No. 126] is **GRANTED** as to
    the non-patent issue of false advertising.

4.  Plaintiff's Motion for Judgment on the Pleadings [Docket No. 126] as to the
    tortious interference claims is **GRANTED**;

5.  Plaintiff's Motion to Exclude [Docket No. 132] the Expert Testimony of Dean
    Thomson is **GRANTED**; and

6.  Defendants' Amended Motion to Exclude [Docket No. 160] the Expert Testimony
    of Donald Gorowsky is **DENIED**.

7.    Defendants Kristopher and Andrew Morgan are **DISMISSED** from this action.


BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  May 24, 2013.